## VULTEX CORPORATION OF AMERICA et al. v. HEVEATEX CORPORATION et al.

### Nos. 4023, 4281.

District Court, D. Massachusetts.

April 23, 1937.

Robert Cushman, Roberts, Cushman & Woodberry, and William Gates, Jr., all of Boston, Mass., for plaintiffs.

Harrison F. Lyman and Fish, Richardson & Neave, all of Boston, Mass., for defendants.

BREWSTER, District Judge.

These two infringement suits were tried together and may be conveniently considered in one opinion. No. 4023 charges infringement of United States letters patent No. 1,443,149 and No. 4281 charges infringement of United States letters patent No. 1,682,857.

Defendants attack the validity of the claims involved and deny infringement.

The following, so far as it contains statement of facts and conclusions of law, may be deemed a compliance with Equity Rule 70½ (28 U.S.C.A. following section 723).

In order to understand the issues, it may be well to preface this opinion with a brief statement respecting the art involved in the controversy.

The crude rubber of commerce is obtained from a milky looking, watery fluid, called "Latex," in which minute particles of rubber, or rubber hydrocarbon, are in suspension. Latex is an unstable fluid, and unless a preservative, such as ammonia, is mixed with it, it will easily coagulate, or spoil. The crude rubber is obtained by coagulating or separating the solids from the fluid. This, from an early time, has been accomplished in several ways not here material. The crude rubber thus obtained is plastic, is peculiarly susceptible to changes of temperature and readily affected by solvents, and is inelastic when broken down on a mill. In 1840, Goodyear discovered that the physical and mechanical qualities of crude rubber might be changed by the interaction of sulphur and rubber.

From that date the process of vulcanizing rubber has been well known in the art. Vulcanization has been accomplished by mixing with the rubber various ingredients. The process of vulcanization involves a progressive reaction, and as it progresses the crude rubber loses its adhesiveness, its ability to absorb solvent and its sensitivity to temperature changes, and on milling becomes less plastic and more elastic.

I take it from the evidence in the case that, generally speaking, vulcanization is not complete until the mixture has been subjected to heat of a greater or less degree—the amount and duration of heat depending upon the nature and quantities of the ingredients used in the vulcanizing process. For a great many years prior to the entry into the art by Dr. Schidrowitz with the first patent in suit, the vulcanizing process had been applied to the crude rubber after

coagulation and in a dry form. The materials that Dr. Schidrowitz used were known to the prior art, the sulphur or the sulphur compounds as vulcanizing ingredients, the accelerators of these vulcanizing ingredients, and the activators of the accelerators. Their effects were only known on crude rubber. However, as early as 1864, processes had been patented in which the vulcanizing ingredients were added to the latex before coagulation. (See Hancock et al., British No. 3110 (1864); Bloxam, British No. 25,291 (1905); Clarkson, British No. 18,497 (1910); Schidrowitz et al., U.S. No. 1,156,184 (1915).) In Hopkinson, U. S. No. 1,542,388, the use of accelerators in the vulcanizing compound is indicated.

While in some of these patents, notably Schidrowitz and Clarkson, it was suggested that latex might be completely vulcanized before coagulation, it was Dr. Schidrowitz, in the first patent in suit, who first pointed out how this vulcanization could be accomplished.

In his application he recites that he had discovered that substantially uncoagulated caoutchouc-containing material may be vulcanized without prior coagulation of the caoutchouc. This process involved the use of a preservative agent, sulphur, zinc ozide, and a small quantity of piperidine. These ingredients are stirred into the latex and the whole placed in the vulcanizer and subjected to a relatively high degree of temperature for a stated period. After vulcanizing, the liquid is strained and thereafter the rubber may be separated from the strained solution either by evaporation or coagulation, followed by washing and drying by any desired method.

The examples shown in this patent involved low accelerators and high degree of heat. There are two process claims and two product claims said to be infringed. These process claims cover the process for the manufacture of a vulcanized caoutchouc composition, which comprises submitting rubber latex in an alkaline condition to vulcanization. The product claimed is "a novel composition of matter; vulcanized substantially uncoagulated rubber latex."

The process of the first patent, commonly referred to as the "hot process," was old when applied to dry rubber after coagulation. Reading the claims in the light of the prior art, they must be limited to a process which gives a completely vulcanized product, and by this I mean a product which is stable, requiring no further vulcanizing steps after coagulation. When latex is vulcanized according to the first Schidrowitz patent, there will be no progressive change in the degree of vulcanization, and the coagulated rubber will be completely vulcanized when separated from the fluid. Of course, there will be different degrees of vulcanization, depending upon the relative proportion of the ingredients mixed with the latex. In this stable characteristic of the vulcanized latex lies the important distinction between the Schidrowitz process and those which had preceded it. The adding of the vulcanizing ingredients to the latex will result, as time goes on, in a progressive change in the latex unless it has been brought to the point of stability by the application of heat or some well-recognized method of completely vulcanizing the latex, or coagulum.

To state the proposition differently, the prior art practices inevitably produced in the course of time changes in the latex in the direction of vulcanization, but the prior art practice did not give a stable vulcanized product which required no further vulcanizing steps, as is shown in the Schidrowitz patents.

The word "defendant," hereinafter used, refers to Heveatex Corporation unless otherwise indicated. The defendant's practice is that of the prior art and not that of either of the patents in suit. It is one which the defendant Crockett had followed since 1926, before the plaintiffs had acquired the Schidrowitz patents, and one which the plaintiffs still follow in producing a compounded latex which they do not sell under the name of "Vultex," the trade-name plaintiffs have adopted for the products manufactured according to the patents in suit.

The vulcanizing agents which the defendant mixed with the latex are the same or similar to those shown in the patents, but they are mixed in different proportions and no heat treatment or other vulcanizing step whatsoever is performed by the defendant upon its compound. Its compounded latices are not vulcanized latices. They do not possess that essential characteristic of stability which marked Schidrowitz's advance over the prior art. Defendant's product must be subjected to some known vulcanizing process by the user before it can be utilized for any purpose which calls for a vulcanized article.

Plaintiffs attempted to show that the defendant's latex was vulcanized when sold,

but experiments in court on defendant's product, a month old, which had been made according to the formula relied upon as infringing, showed that the coagulum was not a vulcanized product. The experts did not agree as to the extent of vulcanization in the samples of the defendant's product which plaintiffs had obtained, but the evidence goes no further than to establish that defendant's product was manifesting changes in physical properties which suggested a progressive condition naturally resulting from a lapse of time. The evidence falls short of proving that defendant's compounds were completely vulcanized latices.

I find and rule, therefore, that the claims Nos. 8, 9, 19 and 20, being the only claims in suit of the first patent, No. 1,443,-149, are valid but not infringed.

With respect to the second patent in suit, the alleged invention consists only in a modification of the processes described in the first patent (1,443,149). This second discovery is said to be "characterized essentially by vulcanizing the latex-mixing under the conditions prescribed at a temperature below that ordinarily employed in hot methods of vulcanization."

This end is accomplished by either the application of heat "at a suitable temperature below the usual boiling point of water" or the use of such quantities of sulphur, zinc oxide, and ultra-accelerator as will produce the desired change in the product within three or four days at room temperature. Thereupon, the latex, if there is no coalescence, is strained to remove zinc oxide, excess sulphur, and accelerator. Removal of the uncombined sulphur prevents any further change in the product upon standing, thus insuring in the latex the stability which is the earmark of a vulcanized product.

The claims of this patent are all process claims, of which claims 7, 8, 12, and 16 are alleged to be infringed. Claim 8 is sufficiently illustrative: "8. The process for the manufacture of vulcanized rubber compositions which comprises vulcanizing substantially uncoagulated rubber latex in an alkaline condition in presence of an accelerator of vulcanization and a promoter for said accelerator at a temperature below those ordinarily employed in hot vulcanizing methods under such conditions as to preclude any substantial coagulation of the rubber during the vulcanization."

Schidrowitz's application for this patent was involved in several interference proceedings, none of which was based upon any claim now in controversy. Nevertheless, they are of some significance as bearing upon the scope of the invention; for example, on Schidrowitz's motion, the Patent Examiner dissolved, as not disclosing novelty, a count reading as follows: "A process for preparing a latex composition which comprises combining with latex, containing an alkali preservative, a high-powered organic accelerator, stable toward the preservative and which does not coagulate the latex."

Again, in an interference with one Gibbons, priority was awarded to Gibbons on a count which later became his only claim in patent No. 1,654,167 (1927). This claim covered a "process of manufacturing vulcanized rubber compositions which comprises the drying and vulcanization of substantially uncoagulated rubber latex containing an organic accelerator capable of effecting vulcanization at temperatures below those ordinarily employed in hot vulcanization methods."

A study of the Patent Office records leaves no doubt that all that Schidrowitz claimed or could claim was a process that completely vulcanized the rubber particles before coagulation at a temperature below those ordinarily employed in hot vulcanizing methods. As thus limited by the prior art, defendant's latices do not infringe.

On the question of infringement, I concur fully in the following statement, appearing in defendant's brief, which has equal application to both patents in suit: "The patents do not purport to cover a process or product like the defendant's. Defendant's product is not a vulcanized latex nor does defendant use any process which produces a vulcanized latex. An essential characteristic of any vulcanized product, whether it be rubber in dry form or rubber particles suspended in latex, is, as above pointed out, that by the treatment received they required fixed and determined characteristics which do not change materially with the lapse of time. Defendant does not submit its compounded latices to any vulcanizing step whatsoever, and its compounded latices, therefore, do not acquire the characteristics of a vulcanized product. On the contrary, their qualities change progressively as time goes on, and a heat treatment applied by the customer to the coagulated and dried product made from the latex is required in order to vulcanize and thus to stabilize the qualities of the resulting product."

With respect to the second patent, the further question arises whether the process claims are valid as showing invention over the first patent.

From the file wrapper, it appears that the Patent Office allowed 22 process claims originally presented in Schidrowitz's application, after first rejecting all of them on the first patent in suit in view of other references cited.

To overcome this official action, the applicant pointed out that the present invention differed from the earlier patent in that the present process consisted in directly vulcanizing the latex in an uncoagulated state at a low temperature. This end was attained by the use of so-called ultra or high-powered accelerators. The applicant disclaimed any intention of securing a monopoly on any particular accelerating ingredient. The defendant contends that this slight modification of the first patent does not constitute invention. The procedure indicated differs from the procedure indicated in the first patent only in the same way that the so-called "cold vulcanization process" as applied to crude dry rubber, currently in use before Schidrowitz's invention was made, differs from the older "hot vulcanization process." The vulcanizing step, proposed in the second patent, is that known as "cold vulcanization."

When the attorneys for Dr. Schidrowitz were pressing their motion to dissolve the interference, to which reference has already been made, it was argued that there was "no novelty in substituting the high-powered accelerators previously used for the vulcanization of rubber to a latex where accelerators of a lower order and even of the same order had been previously added to latex prior to the coagulation thereof."

I am inclined to think that this argument was sound. It would seem to be obvious to any chemist, endowed with a reasonable knowledge of the art of vulcanizing rubber, that the cold vulcanizing process, well-known in its application to dry rubber, could likewise be applied in a process of vulcanizing the latex. This, in my opinion, would not amount to a patentable discovery.

The presumption which usually attends the granting of a patent is weakened by the disclosures of the file wrapper. Furthermore, it ought not to be indulged in a case where the effect is to extend the life of an earlier patent by sustaining a later patent upon a slight and obvious modification of the former.

I have, therefore, reached the conclusion with respect to the second patent that none of the claims relied upon are valid, and if valid they are not infringed.

A decree may be entered, therefore, dismissing both bills of complaint.